**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |
|---|---|
| NORTH ATLANTIC STATES REGIONAL COUNCIL OF CARPENTERS, LOCAL UNION NO. 3073 of the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> DONALD J. TRUMP, as he is PRESIDENT OF THE UNITED STATES of AMERICA, PETER HEGSETH, as he is SECRETARY OF DEFENSE, and SCOTT KUPOR as he is DIRECTOR of the OFFICE of PERSONNEL MANAGEMENT, <br><br> *Defendants*. | C.A. No. |

## COMPLAINT

## NATURE OF THE ACTION

Plaintiff North Atlantic States Regional Council of Carpenters, Local Union No. 3073 of the United Brotherhood of Carpenters and Joiners of America brings this action for declaratory and injunctive relief against President Donald J. Trump, in his official capacity, and Secretary Peter Hegseth, in his official capacity, to challenge President Trump's Executive Order No. 14251, *Exclusions from Federal Labor-Management Programs*, 90 Fed. Reg. 14,553 (March 27, 2025) ("Executive Order")[1] illegally purporting to strip the Union's members of their collective bargaining rights.

---

[1] When asked for comment about its actions against Plaintiff, the Department of Defense stated that "[t]he Department is executing Presidential Executive Orders 14251 and 14343, which concerns the termination of certain collective bargaining agreements." Department of Defense ends union agreements at Portsmouth Naval Shipyard (April 19, 2026), https://perma.cc/8LER-9R7J. However, Executive Order No. 14343 does not reference or otherwise implicate

1

## JURISDICTION & VENUE

1.      This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege claims arising under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

2.      Venue lies in this District pursuant to 28 U.S.C. § 1391(e)(1)(B), because, as described *infra*, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

3.      Plaintiff North Atlantic States Regional Council of Carpenters, Local Union No. 3073 of the United Brotherhood of Carpenters and Joiners of America (the "Union") is a labor organization, as defined by Section 2(5) of the LMRA, 29 U.S.C. Section 152(5). The Union is a local union, within a regional council, which serves as the bargaining representative for a bargaining unit of approximately one hundred and twenty (120) civilian plastic fabricators and shipwrights employed by the U.S. Department of the Navy (the "Unit") at the Portsmouth Naval Shipyard, Seavey Island, Kittery, Maine (the "Shipyard").

4.      Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

5.      Defendant Peter Hegseth is the United States Secretary of Defense. He is sued in his official capacity.

6.      Defendant Scott Kupor is the Director of the Office of Personnel Management. He is sued in his official capacity.

## FACTS

---

any employee of, or labor organization at, the Portsmouth Naval Shipyard. As a result, only Executive Order No. 14521 is at issue in the instant matter.

*Establishment of the Prevailing Wage System*

7.      In 1972, Congress passed the Government Employees Prevailing Rate Systems Act ("PSRA"), Pub.L. No. 92-392, 86 Stat. 564 (1972), codified at 5 U.S.C. §§ 5341–5349, which created a class of federal "prevailing rate employees," who are not subject to the General Schedule.

8.      In the PSRA, Congress recognized that there was a need to standardize pay for prevailing rate employees within the same local wage area and to maintain the level of rates of pay so as to attract and retain qualified prevailing rate employees to work in the federal government. *See* 5 U.S.C. § 5341.

9.      Accordingly, under the PSRA, hourly wages for prevailing rate employees are calculated based on wages prevailing in the industry in which they work, rather than fixed by the General Schedule otherwise applicable to other federal government employees. *U.S. Info. Agency v. Fed. Lab. Rels. Auth.*, 895 F.2d 1449, 1451 (D.C. Cir. 1990); see also 5 U.S.C. § 5341.

10. The PSRA defines a "prevailing rate employee" as "an individual employed in or under an agency in a recognized trade or craft, or other skilled mechanical craft, or in an unskilled, semiskilled, or skilled manual labor occupation . . ." 5 U.S.C. § 5342(a)(2)(A).

11.      The federal "prevailing rate employee" classification covers most trade, craft, and laboring employees. *See* U.S. Office of Personnel Management "Facts About the Federal Wage System,"       (https://www.opm.gov/pdolicy-data-oversight/pay-leave/pay-systems/federal-wagesystem/facts-about-the-federal-wage-system/).

12.      The PSRA was intended to provide specific safeguards and inducements to individual prevailing rate employees who do not participate in the collective bargaining process. *Medler v. U.S., Bureau of Reclamation, Dep't of the Interior*, 616 F.2d 450, 453 (9th Cir. 1980).

13.    However, the PSRA also recognized that prevailing rate employees who did participate in the collective bargaining process would require similar protections if not for their terms and conditions of employment being protected by contracts negotiated on their behalf by their unions.

14.    Accordingly, Congress made clear that the PSRA was not intended to affect the status of federal sector collective bargaining agreements "or to impair the authority of the parties concerned to renegotiate existing contracts or enter into new agreements." *Medler*, 616 F.2d at 454 (citing H.R. Rep. No. 92-339, 92nd Cong., 1st Sess. 5, 22 (1971)).

15.    To ensure there was no disruption to, or modification of, the historical collective bargaining relationships for this subset of prevailing rate employees, Congress included a savings clause, set forth in Section 9(b) of the PRSA ("Section 9(b)").

16.    Section 9(b) was directed at "those groups of Federal employees whose wages and other terms or benefits of employment are fixed in accordance with the contracts resulting from negotiations between their agencies and employee organizations." *Id.* at 453 (citing H.R. Rep. No. 92-339, at 22).

17.    Section 9(b) provided that the PSRA should not be construed to "abrogate, modify, or otherwise affect" any pre-existing negotiated contract provisions dealing with "wages, the terms and conditions of employment, and other employment benefits . . . resulting from negotiations between Government agencies and organizations of Government employees" or "impair in any way" the right of the parties to these bargaining agreements to "renew[], extend[], modify[], or improve[]" the provisions of the bargaining agreements, or replace them with new contracts. Pub.L. No. 92–392, 86 Stat. at 574.

*Civil Service Reform Framework*

18.     Prior to 1978, collective bargaining for federal government employees was authorized and governed by two separate executive orders issued in 1962 and 1969. *See* Executive Order 10,988, *Employee-Management Cooperation in the Federal Service*, 27 Fed. Reg. 551 (Jan.17, 1962); Exec. Order 11,491, *Labor-Management Relations in the Federal Service*, 34 Fed. Reg. 17,605 (Oct. 31, 1969).

19.     Six years after passage of the PSRA, in order to "overhaul[] the civil service system," Congress passed the Civil Service Reform Act of 1978.

20.     In relevant part, the Civil Service Reform Act included the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 et seq., codified as Chapter 71 of Title 5 of the United States Code (the "Statute" or, in the alternative, "Chapter 71"), as a central aspect of Congress's federal civil service reform.

21.     Unlike the prior system of executive fiat, the Statute set forth a comprehensive framework governing collective bargaining in the federal civil service, balancing "the special requirements and needs of the Government," 5 U.S.C. § 7101(b), and "statutory protection of the right of [federal] employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them." 5 U.S.C. § 7101(a)(1).

22.     The Statute generally requires bargaining over matters impacting terms and conditions of employment, *see* 5 U.S.C. § 7103(a)(14), though this does not extend to matters established by federal statute or by government-wide regulations. *Id.* §§ 7103(a)(14)(c) & 7117(a)(2).

23.     Under the Statute, federal employees have no right to engage in strikes or work stoppages. *Id.* § 7311.

5

24.     Due to their sensitive nature, the Statute explicitly excludes certain employees from coverage, including those of the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the United States Secret Service. 5 U.S.C. § 7103(a)(3).

25.     The Statute grants the President the narrow authority to exclude additional agencies from coverage, only through a determination that an "agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) the Statute "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

26.     With the exception of President Biden, every president beginning with President Carter has used Section 7103(b)(1) to exclude agency subdivisions and organizational subcomponents from Chapter 71. These prior exclusions were narrow—never including an entire Cabinet Department—and the subdivisions excluded from Chapter 71 had an obvious link to national security, such as the National Drug Intelligence Center and Office of Intelligence Policy and Review, Department of Justice, *see* Exec. Order 13252, 67 Fed. Reg. 1601 (Jan. 7, 2002), and Defense Counterintelligence and Security Agency, Department of Defense, see Exec. Order 13869, 84 Fed. Reg. 18125 (Apr. 24, 2017).

*The Statute and the PSRA*

27.     In addition to its other provisions, Congress included Section 704 ("Section 704"), in the Statute, reaffirming and extending the savings clause of Section 9(b). *See* Pub.L. No. 92–454, 92 Stat. 1111, 1218 (1978) (codified as 5 U.S.C. § 5343).

28.     Echoing Section 9(b) of the PSRA, Section 704 protects the rights of federal prevailing rate employees covered under a collective bargaining agreement.

29.      Specifically, Section 704(a) provides that the "terms and conditions of employment and other employment benefits with respect to Government prevailing rate employees to whom [Section 9(b)] applies which were the subject of negotiation in accordance with prevailing rates and practices prior to August 19, 1972, shall be negotiated . . . in accordance with the provisions of [Section 9(b)] without regard to any provision of [the Statute] . . . to the extent that any such provision is inconsistent with this paragraph." *Id.* (emphasis added).

30.      Section 704(b) further provides that "[t]he pay and pay practices relating to employees referred to in paragraph (1) of this subsection shall be negotiated in accordance with prevailing rates and practices without regard to any provision of . . . [the Statute]…to the extent that any such provision is inconsistent with this paragraph . . . " Id. (emphasis added).

31.      In other words, Section 704 was explicitly intended to "preserve unchanged the scope and substance of the existing collective bargaining relationship between the employees' representatives and the agencies involved" by "exclud[ing] these employees from the restrictions on the scope of collective bargaining under [the Statute] . . . " H.R. Rep. No. 95-1403, at 61–62.

32.      To that end, Section 704 "'grandfather[s]-in' bargaining rights for prevailing rate employees with respect to subjects that might otherwise be non-negotiable 'management rights' under 5 U.S.C. § 7106 or nonnegotiable pay provisions reserved to agency regulation." U.S. Info. Agency, 895 F.2d at 1451.

33.      Section 704 thus maintains the collective bargaining rights and relationships for those prevailing rate employees covered under Section 9(b), as of August 19, 1972, in order to ensure that these critical federal employees are not lost to the private sector. *See* 124 Cong. Rec. 25, 722 (1978) (explaining that the existing collective bargaining relationships resulted in "some

of the most stable and effective collective bargaining in the history of public employee labor relations.").

34.    Section 704 is grounded in Congress's concerns about losing federal prevailing rate employees to the private sector. 124 Cong. Rec. 25, 722 (1978) (explaining that these collective bargaining relationships were critical in "enabl[ing] the Federal Government to procure and retain qualified craft employees who otherwise might choose employment in private industry…"); *see also* H.R. Rep. No. 95-1403, 95th Cong., 2d Sess. 61–62 (1978).

35.    Thus, as long as a particular term and condition of employment or employment benefit was subject to collective bargaining prior to August 19, 1972, Section 704 and Section 9(b) preserve right to collectively bargain as to that subject matter for covered prevailing rates employees, regardless of any other provisions of the Statute.

## *Executive Order No. 14251*

36.    On March 27, 2025, President Trump issued the Executive Order, conclusively stating that the Statute would no longer be applied for national security reasons to seventy-five percent (75%) of all previously union-represented civilian employees across eleven Cabinet departments and seven other independent agencies.

37.    In relevant part, the Executive Order excluded all 772,00 civilian employees of the Department of Defense from the protections of the Statute, "except for any subdivisions excluded pursuant to section 4 of the [Executive Order]."

38.    In relevant part, Section 4 of the Executive Order purported to delegate "authority under 5 U.S.C. 7103(b)(1)" to the Secretary of Defense to "suspend" the application of the Executive Order for any subdivision of the Department, thereby bringing employees back within the protections of the Statute.

8

39. Specifically, Section 4 of the Executive Order requires that the Secretary of Defense certify that the Statute can be applied to a subdivision consistent with national security applications and submit any such certification in the Federal Register.

40. At the same time, however, Section 2 of the Executive Order contains a blanket carveout that preserves collective bargaining for all "police officers, security guards, [and] firefighters."

41. Section 6 of the Executive Order further directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the Federal Labor Relations Authority involving exceptions or arbitral awards or unfair labor practices.

42. Contrary to the plain language of 5 U.S.C. § 7103(b)(1), the White House "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2GMUSH, which accompanied the Executive Order contained no findings that any specific subdivision of the Department of Defense "has as a primary function [of] intelligence, counterintelligence, investigative, or national security work," or that (2) the Statute "cannot be applied to that . . . subdivision in a manner consistent with national security requirements and considerations."

43. Instead, the White House Fact Sheet of March 27, 2025, omitted specific discussion of Department of Defense labor relations in its entirety, in favor of broad generalizations that "[c]ertain Federal unions have declared war on President Trump's agenda," the Statute allows "hostile Federal unions to obstruct agency management," and that an insufficient number of collective bargaining agreements will expire during President Trump's term.

44.    On the same day the Executive Order was publicly released, Acting Director of Office of Personnel Management ("OPM"), Charles Ezell, issued a memorandum providing guidance to agency leadership regarding implementation of the Executive Order. *See* Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025) ("OPM Guidance"), https://perma.cc/V6WH-435Z.

45.    The OPM Guidance declared that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in the Executive Order, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Executive Order.

46.    The OPM Guidance also directed agencies to "cease participating in grievance procedures after terminating their CBAs."

47.    After initially directing agencies to refrain from terminating collective bargaining agreements or decertifying bargaining units during the pendency of litigation, OPM updated its OPM Guidance on August 13, 2025, to notify federal agencies that they are free to unilaterally terminate their collective bargaining agreements under the Executive Order.

*Portsmouth Naval Shipyard*

48.    The Shipyard was established in 1800 and is one of four remaining naval shipyards in the nation operated by the Naval Sea Systems Command.

49.    The Shipyard is responsible for overhauling, refueling, and modernizing work on U.S. Navy nuclear submarines and, with three dry docks, is capable of docking all active classes of submarines including the *Los Angeles* and *Virginia* classes.

50.     The Shipyard is located at the southernmost tip of Maine, and it fully encompasses the 297 acres of the federally owned Seavey Island sitting at the mouth of the Piscataqua River.

51.     The Shipyard employs approximately 6,000 civilian employees, as well as those representing Portsmouth Naval Shipyard Detachment - San Diego, San Diego, California.

52.     Various labor organizations have represented employees at the Shipyard since at least 1936.

53.     Over the last twenty (20) years, the Shipyard has been repeatedly recognized via awards, including the 2016 SECDEF Award for Depot Maintenance Excellence; the 2015 SECNAV Environmental Restoration-Installation and Natural Resources Conservation Award; the 2013 Chief of Naval Operations Safety Award – Sustainability; and the 2012 Chief of Naval Operations Safety Award.

54.     Over the last twenty (20) years, the Shipyard has repeatedly completed vessel overhauls on time and under budget, including the USS *Oklahoma City*, USS *Dallas*, and USS *Pittsburgh*.

55.     Over the last twenty (20) years, the Shipyard has also repeatedly completed vessel overhauls earlier than planned, including the USS *Providence*, USS *Alexandria*, USS *Springfield*, USS *California*, and USS *Topeka*.

*UBC Local Union No. 3073*

56.     The Union was charted in 1954, prior to adoption of the Statute, and it has continuously represented the instant Unit since that time.

57.     Unit shipwrights are responsible for traditional carpentry work at the Shipyard, such as installing temporary decking, putting caps on keel blocks, or building stairways, cradles,

11

temporary buildings or platforms. Unit shipwrights also construct staging and/or scaffolding for other projects and trades.

58.     Unit plastic fabricators perform a range of functions that arose out of carpentry work and are unique to their trade, such as hull treatments, damping tile and rubber work. Although some of their work is performed in a back shop, most of it is done on, or in, submarines.

59.     From 1954 to approximately 2018, the Union represented the Unit as part of the multi-trades Portsmouth Federal Employees Metal Trades Council, affiliated with the AFL-CIO.

60.     From 1954 to approximately 2018, by and through the Metal Trades Council, the Union was party to a succession of collective bargaining agreements regarding covered work performed at the Shipyard which governed the terms and conditions of employment of Unit members.

61.     In 2019, following a severance petition in FLRA Case No. BN-RP-16-0020, the Union was independently certified as the exclusive collective bargaining representative of the Unit.

62.     Congress first implemented a prevailing rate scheme for U.S. Navy shipyards on July 16, 1862, directing that "the hours of labor and the rate of wages of the employee in the navy yards shall conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity of the respective yards, to be determined by the commandants of the navy yards, subject to the approval and revision of the Secretary of the Navy." Chapter 183, 12 Stat. 583.

63.     Between 1924 and 1972, Congress and the Department of Defense regularly revisited the prevailing rate scheme for naval shipyards generally and the Shipyard specifically, including the method of wage calculation, the regional basis for determining prevailing rates, and the administrative agency responsible for setting prevailing rates.

64.    Congress and the Department of Defense have consistently considered the implementation and administration of a prevailing rate system specific to naval shipyards to be an important factor in recruiting and retaining skilled tradespeople in support of national defense priorities. *See* "To Provide a Method for Regulating and Fixing Wage Rates for Employees of Portsmouth Naval Shipyard": Hearing on S. 19 Before the H. Comm. on Armed Servs., 86th Cong. (August 11, 1959).

65.    Unit shipwrights and plastic fabricators are prevailing rate skilled trade employees and continue to be hired and paid according to the Federal Wage System schedule established under the PSRA and its predecessors, subject to the terms of applicable collective bargaining agreements. *See* Naval Sea Systems Command Portsmouth Naval Shipyard, "Skilled Trades" (https://www.navsea.navy.mil/Home/Shipyards/Portsmouth/Careers/Skilled-Trades/).

66.    In sum, Plaintiff represents Unit employees who are "prevailing rate employees" under the PRSA and who fall within the protections of Section 9(b) because their "wages, the terms and conditions of employment, and other employment benefits" were determined through collective bargaining prior to August 19, 1972.

67.    From 1954 to present, Unit employees have faithfully practiced their trades in support of the Shipyard's service to the Navy and the nation by supplying the submarine fleet with high quality, affordable, overhaul, refueling and modernization work.

68.    From 1954 to present, the Union has been a productive labor relations partner with the Shipyard through multiple conflicts, including the Vietnam War, the Global War on Terror, and the current conflict with Iran.

13

69.     From 1954 to present, the Union has not engaged in a work stoppage, or any other related activity, impacting the ongoing operations and functions of the Shipyard or otherwise inconsistent with national security.

70.     From 1954 through 2025, the Union and its members were not included as part of the fourteen (14) prior Presidential Executive Orders which narrowly excluded certain targeted federal agency subdivisions that were clearly engaged in sensitive intelligence and/or national security work from the Statute, including when the government was reorganized to create the Department of Homeland Security.

71.     On or about September 30, 2020, General President McCarron of the Union's international body, the United Brotherhood of Carpenters and Joiners of America ("UBC"), announced that the UBC would endorse then-Senator Joseph Biden for President.

72.     On or about August 4, 2024, General President McCarron announced that the UBC would endorse then-Vice President Kamala Harris for President.

*Impact of the Executive Order on Local 3073*

73.     On or about April 9, 2025, the Union, through its Business Representative Nathan Proper ("Proper"), was informed by Shipyard labor relations members of the terms of the Executive Order and impending termination of the Union's collective bargaining relationship with the Shipyard.

74.     On April 10, 2025, the Union transmitted a request, via letter, to Vice Admiral Downey, Commander, Naval Sea Systems Command, requesting that the Union receive an exemption under Section 4 of the Executive Order. To date, the Union has not received a formal response.

75.     On April 17, 2025, Secretary Hegseth issued an order exempting "federal wage system employees in the trades" in only four Department of Defense subdivisions: Letterkenny Munition Center, Air Force Test Center, Air Force Sustainment Center, and Fleet Readiness Center Southwest. *See* DOD, Executive Order 14251 Certification, 90 Fed. Reg. 17,052 (April 23, 2025).

76.     The Executive Order 14251 Certification of April 23, 2025, contains no explanation as to how the four Department of Defense subdivisions of trades workers were chosen, what distinguishes the exempt employees from almost identical civilian employees in other localities, or any further explanation as to why other subdivisions are inappropriate for inclusion under the Statute.

77.     Between April 2025 and January 2026, the Shipyard ceased withholding Union dues from member pay, but it otherwise continued to recognize the parties' collective bargaining agreement. The Shipyard also continued to let the Union utilize official time as needed, process grievances, and occupy Shipyard office space.

78.      In or about May 2026, the Shipyard officially ceased recognition of the Union, informing Proper that the Union could no longer use Shipyard office space, that it was barred from storing Union records on Shipyard property, and that the parties' collective bargaining agreement was now terminated.

79.     In or about May 2026, the Shipyard officially prohibited Proper from using official time to conduct Union activity in support of peaceful labor relations and directed him to return to his normal duties.

80.     Under the terms of the Executive Order, the International Association of Firefighters ("IAFF") bargaining unit at the Shipyard was not affected, and those union members employed by the Shipyard continue to retain their collective bargaining rights.

81.     Through enforcement of the Executive Order against the Union, the Shipyard ceased participating in interim bargaining as required by the parties' collective bargaining agreement, thereby preventing the Union from bargaining over mandatory terms and conditions of employment that might change during the term of the current collective bargaining agreement.

82.     Through enforcement of the Executive Order against the Union, the Shipyard ceased participating in grievance arbitration as required by the parties' collective bargaining agreement, thereby preventing the Union from enforcing contractual rights and protecting its members.

83.     Through enforcement of the Executive Order against the Union, the Shipyard ceased transmitting bargaining unit workers' voluntary union dues payments as required by the parties' collective bargaining agreement and the Statute, thereby causing the Union continuing financial harm and, importantly, frustrating its ability to pay for the costs associated with representation of the bargaining unit workers.

84.     Through enforcement of the Executive Order against the Union, the Union will continue to lose members who are no longer incentivized to join the Union, because it no longer has status as the collective bargaining representative, thereby eliminating the Union's core function.

85.     Through enforcement of the Executive Order against the Union, the Shipyard is actively depriving its workers of vital statutory protections, such as the right to engage in union activity "freely and without fear of penalty or reprisal," 5 U.S.C. § 7102, that protect their right to join unions.

86.     Through enforcement of the Executive Order against the Union, the Shipyard has reassigned employees performing representational duties pursuant to official-time arrangements

in the parties' collective bargaining agreement, stopped Plaintiff from using Shipyard property in support of its terminated pending grievance proceedings, and removed any redress available before the Federal Labor Relations Authority.

**COUNT I – ULTRA VIRES ACTION**
**(Violation of the Separation of Powers - 5 U.S.C. § 7103(b)(1))**

87.     Plaintiffs incorporate by reference paragraph 1-86, above.

88.     Under 5 U.S.C. § 7103(b)(1), the President may exclude an executive branch subdivision from coverage under the Statute only if it finds that: (a) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (b) "the provisions of [the Statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

89.     The Executive Order contains no such findings specific to either the Department of Defense as a whole, or the Shipyard as its subdivision.

90.     Conversely, in place of specific findings, the Executive Order contains broad, conclusive statements regarding the compatibility of federal sector labor relations with the President's political agenda and complaints about the length of collective bargaining agreements.

91.     The Executive Order could not have been based on a lawful, factual determination, as it excludes the Unit from the protections of the Statute despite the Unit having been continuously represented by the Union for more than 60 years without any interference with "national security requirements and considerations."

92.     The Executive Order also fails to exercise its statutory authority in a cognizable way, as it purports to exclude only a portion of the Shipyard subdivision—the Unit—while allowing the collocated IAFF bargaining to continue its collective bargaining relationship under

17

the Statute. No such discrete, granular power is granted under the plain text of 5 U.S.C. § 7103(b)(1).

93.     Because the Executive Order goes beyond the narrow authority granted by Section 7103(b) and thereby impermissibly effectuates a partial repeal of the Statute, the Executive Order and Defendants' implementation each separately violates the Constitution's separation of powers.

**COUNT II – ULTRA VIRES ACTION**
**(Violation of the Separation of Powers - 5 U.S.C. § 5343)**

94.     Plaintiffs incorporate by reference paragraph 1-93, above.

95.     Pursuant to Section 704 of the Statute, codified as 5 U.S.C. § 5343, the scope and substance of collective bargaining rights of federal prevailing rate employees subject to Section 9(b) of the PSRA that existed as of August 19, 1972, are preserved "without regard to any provision" of the Statute "to the extent that any such provision is inconsistent."

96.     In enacting Section 704, Congress explained that the provision exists to "preserve unchanged the scope and substance of the… collective bargaining relationship" between federal prevailing rate employees and the relevant government agencies that existed as of August 19, 1972, and "excludes these employees from the restrictions on the scope of collective bargaining" under Chapter 71.

97.     Plaintiff is a union local affiliated with the UBC that represents prevailing rate employees subject to Section 9(b), whose collective bargaining rights are preserved, without regard to any provision of Chapter 71, including Section 7103(b). Indeed, the prevailing rate employees represented by Plaintiffs are "exclude[d] … from the restrictions on the scope of collective bargaining" set out in Chapter 71.

98.     Despite Section 704's clear protection for the collective bargaining rights of federal prevailing rate employees subject to Section 9(b), the Executive Order purports to invoke 5 U.S.C.

18

§ 7103 to exclude the overwhelming majority of civilian employees employed by the Department of Defense and its subdivisions from coverage under Chapter 71, thereby purporting to relieve these agencies of their collective bargaining obligations.

99.     As it relates to prevailing rate employees subject to Section 9(b), the Executive Order is thus contrary to Section 704.

100.    To the extent the Executive Order purports to breach or terminate the collective bargaining agreements of federal prevailing rate employees subject to Section 9(b) of the PSRA, like the employees represented by the Plaintiff, the Executive Order violates Section 704 of the Statute, which preserves the collective bargaining rights of these very employees notwithstanding any restriction in Chapter 71.

101.    Because the Executive Order is contrary to Section 704 of the Statute, the Executive Order and Defendants' implementation each separately violates the Constitution's separation of powers, and the Executive Order is *ultra vires* and void even if it satisfies the terms of 5 U.S.C. § 7103(b)(1).

## COUNT III – VIOLATION OF THE APA
### (5 U.S.C. § 706(2)(A))

102.    Plaintiffs incorporate by reference paragraph 1-101, above.

103.    Under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A), a reviewing court "shall…hold unlawful and set aside agency action" that is "arbitrary and capricious" or "contrary to law."

104.    Section 4 of the Executive Order delegated to Defendant Secretary Hegseth the authority to suspend the application of the Executive Order to any subdivision of the Department of Defense if he certified that "the provisions of [the Statute] can be applied to such subdivision in

19

a manner consistent with national security requirements and considerations" and to publish any such certification in the Federal Register.

105. On April 23, 2025, Defendant Secretary Hegseth issued a certification, published in the Federal Register, which suspended the application of the Executive Order for "federal wage system employees in the trades at the following DOD component subdivisions . . . (a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army; (b) Air Force Test Center, Air Force Materiel Command, Department of the Air Force; (c) Air Force Sustainment Center, Air Force Material Command, Department of the Air Force"; and (d) Fleet Readiness Center Southeast."

106. Defendant Secretary Hegseth's April 23rd certification was a final agency action reviewable under the Administrative Procedures Act.

107. Defendant Secretary Hegseth's exercise of his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's application to certain Department subdivisions is arbitrary and capricious and contrary to law.

108. Defendant Hegseth provided no reasoned explanation as to why the application of the Executive Order to the trades employees at four Department subdivisions was "consistent with national security requirements and considerations," whereas application of the Executive Order to all other Department subdivisions was purportedly not.

109. Defendant Secretary Hegseth's failure to explain his decision not to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's application to other Department subdivisions is arbitrary and capricious and contrary to law.

110. Conversely, Defendant Secretary Hegseth and his designees have never acknowledged or responded to Plaintiff's April 10, 2025, letter which explicitly and respectfully

20

requested that the Unit be granted an exemption from exclusion under Section 4 of the Executive Order.

111. Defendant Secretary Hegseth was required to provide an explanation of his decision that the Statute cannot be applied to the Unit "consistent with national security," because the decision is a monumental change in the Department's longstanding position on this issue.

112. The Shipyard has had collective bargaining relationships with various labor organizations—including the Union—for decades prior to the implementation of the Statute without issue.

113. Despite multiple globe-spanning conflicts over the last seven decades, no prior Secretary of Defense has sought to strip Shipyard workers, including those within the Unit, of their collective bargaining rights.

114. There also is no relevant difference, for purposes of national security considerations, between the bargaining units Defendant Secretary Hegseth exempted from the Executive Order, and the bargaining units Defendant Secretary Hegseth did not exempt.

115. The Unit represented by the Plaintiff performs essentially the same type of work of the other Department of Defense subdivisions who were exempted.

116. Similarly, Defendant Secretary Hegseth provided no reasoned explanation as to why application of the Executive Order to the Unit is purportedly not "consistent with national security requirements and considerations," when an IAFF bargaining unit of firefighters at the same installation is permitted to maintain their collective bargaining representation.

117. In particular, the shipwrights represented by the Plaintiff in this matter perform an overall operations support function analogous to the IAFF bargaining unit but have been excluded from coverage under the Statute.

118.    Defendant Secretary Hegseth's action was arbitrary and capricious and contrary to the APA because any reasonable analysis would conclude that collective bargaining for Plaintiff's Unit is not only is consistent with national security but, rather, has greatly enhanced national security by attracting and maintaining a skilled civilian workforce capable of regularly performing work faster and cheaper than with private shipyards. As such, Defendant Secretary Hegseth's decision-making is without any evidentiary support.

119.    Defendant Secretary Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order is also contrary to law, because the Executive Order exceeds the President's narrow statutory authority and is therefore *ultra vires*.

### COUNT IV – VIOLATION OF THE CONSTITUTION
**(First Amendment Claim)**

120.    Plaintiffs incorporate by reference paragraph 1-119, above.

121.    The First Amendment to the United States Constitution protects against government actions "abridging the freedom of speech" and "the right of the people … to petition the Government for a redress of grievances."

122.    The White House Fact Sheet released alongside the Executive Order was issued in retaliation for the protected speech and petitioning activities of the labor organizations that represent federal employees who have exercised their First Amendment rights to support opposition candidates, including the UBC.

123.    The Executive Order generally aims to chill the protected speech and petitioning activity of all federal sector labor unions going forward.

124.    The message that labor organizations supporting Trump Administration policies will receive favorable treatment, and those opposing Trump Administration policies will receive punishment, is reinforced by the Executive Order's blanket exception preserving collective

22

bargaining rights for public safety labor organizations—regardless of agency or subdivision—because the Trump Administration plainly considers their support more valuable than any national security considerations.

125.    The Plaintiff's parent labor organization has previously exercised its First Amendment rights to endorse political candidates other than President Trump. Such First Amendment activity is part of our constitutional system, not a threat to national security for purposes of 5 U.S.C. § 7103(b)(1) .

126.    The Executive Order's stated purpose and effect is to harm and punish labor organizations for First Amendment-protected speech and to chill such protected activity in the future.

127.    To the extent Defendant Secretary Hegseth, by and through the Office of Personnel Management, has sought to implement the Executive Order, these actions are also retaliatory and unconstitutional in purpose and effect.

## COUNT V – VIOLATION OF THE CONSTITUTION
### (Fifth Amendment Due Process Claim)

128.    Plaintiffs incorporate by reference paragraph 1-127, above.

129.    The Due Process Clause of the Fifth Amendment of the United States Constitution protects against deprivations of property "without due process of law" and provides that "private property" shall not be "taken for public use, without just compensation."

130.    Collective bargaining agreements entered into pursuant to the Statute are contracts that bind federal agencies and unions representing their employees. *See* 5 U.S.C. §§ 7114(c)(3); 7116.

23

131.    Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934). As such, contracts with the federal government are protected by the Takings Clause. *Id.*

132.    Where Congress has "the power to authorize" contracts, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch*, 292 U.S. at 579. *See also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

133.    From 1954 to present, the Plaintiff has been a party to collective bargaining agreements with the federal government that are binding, bilateral contracts.

134.    The Union's collective bargaining agreement did not, and does not, interfere in any way with national security and, instead, has contributed to the labor management peace which has allowed the Shipyard to consistently surpass time and financial goals.

135.    The Executive Order, the Fact Sheet, and any related OPM Guidance or directives seeking to nullify the parties' collective bargaining agreement serves to extinguish vested rights under them, such as ongoing bargaining obligations regarding terms and conditions of employment over actions predating the Executive Order, as well as any bargaining obligations that might arise on or after March 27, 2025.

136.    Defendants' actions deprived the Union and its members of their vested rights under the parties' collective bargaining agreement, and thus their constitutionally protected contractual property interests.

137.    The Defendants' actions served no legitimate public purpose or rational justification but were instead meant to serve an explicitly personal and political purpose.

24

138.    The Executive Order and any related OPM Guidance or implementation therefore constitute unlawful takings in violation of the Fifth Amendment's guarantee of substantive due process.

## COUNT VI – VIOLATION OF THE CONSTITUTION
### (Fifth Amendment Equal Protection Claim)

139.    Plaintiffs incorporate by reference paragraph 1-138, above.

140.    The due process guarantee of the Fifth Amendment to the United States Constitution includes a guarantee of equal protection. *See United States v. Windsor*, 570 U.S. 744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

141.    "The Constitution's guarantee of equality 'must at the very least mean that a bare… desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534–35 (1973)).

142.    The Fact Sheet released alongside the Executive Order explicitly references the latter's bare political motivation to harm labor organizations unpopular with the Trump Administration by punishing "[c]ertain Federal unions [that] have declared war on President Trump's agenda."

143.    The Executive Order's carve out of public safety labor organizations also further underscores its political motivations and the intent to victimize specific labor-related organizations absent any legitimate governmental purpose.

144.    As a result, the Executive Order and any related OPM Guidance or implementation therefore also constitute a violation of the Fifth Amendment's guarantee of equal protection.

## COUNT VII – VIOLATION OF THE CONSTITUTION
### (Fifth Amendment Procedural Due Process Claim)

145.    Plaintiffs incorporate by reference paragraphs 1-144, above.

25

146.    The Fifth Amendment's also provides protection against deprivations of property "without due process of law" requires, at a minimum, notice and an opportunity to be heard before the government may deprive a person of property.

147.    As previously noted, "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch*, 292 U.S. at 579.

148.    The Executive Order and any related OPM Guidance seek to retroactively nullify the parties' collective bargaining agreement and extinguish pending grievances over actions predating the Executive Order as well as any grievances that might be filed on or after March 27, 2025.

149.    This attempted nullification thus deprives the Union and its Union members of their constitutionally protected contractual property interests without having afforded Plaintiffs any notice or the opportunity to be heard.

150.    As result, the Executive Order and any related OPM Guidance are in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.,* 758 F.3d 296, 318 (D.C. Cir. 2014).

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs pray that this honorable Court grant the following relief:

(a) A declaratory judgment that:

1) the Executive Order, any related OPM Guidance, and their resultant nullification of Plaintiff's statutory and contractual rights, are ultra vires, in violation of the separation of powers, in violation of the First Amendment's protection of speech,

26

in violation of the Fifth Amendment's guarantee of equal protection of the laws, and in violation of the Fifth Amendment's protection against unlawful takings and its guarantee of substantive and procedural due process; and

2) Defendant Secretary Hegseth's failure to suspend application of the Executive Order with respect to Plaintiffs' bargaining units or to explain that failure violates the Administrative Procedure Act;

(b) Preliminary and permanent injunctive relief that:

1) prohibits the Defendants and their agents and successors from implementing or otherwise giving effect to the Executive Order and any related OPM Guidance with respect to Plaintiff and its members; or, in the alternative,

2) sets aside Defendant Secretary Hegseth's April 23, 2025, Executive Order 14251 Certification insofar as it failed to suspend the Executive Order as to Plaintiff's Unit and directs Defendant Secretary Hegseth to address the question of whether suspending the Executive Order as to Plaintiff's Unit is warranted under 5 U.S.C. § 7103(b).

(c) an order granting Plaintiff its attorney's fees and costs; and

(d) an order granting such other relief as this Court may deem just and proper.

**Dated:** July 7, 2026

Respectfully submitted,

On behalf of the Plaintiff,

By its attorneys,

*/s/ Jeffrey Neil Young*

27

Thomas R. Landry, PHV Pending
Carey D. Shockey, PHV Pending
Luke Liacos, PHV Pending
Krakow, Souris & Landry, LLC
90 Canal Street, 4th Floor
Boston, MA 02114
P: (617) 723-8440

Jeffrey Neil Young
Solidarity Law, PLLC
97 India St. 2d Floor
Portland, ME 04101
207-844-4243
jyoung@solidarity.law

28